JOE KAYS, RESPONDENT, v. CITY OF VERSAILLES, APPELLANT.[*]

Kansas City Court of Appeals. December 2, 1929.

*Corpus Juris-Cyc. References: Municipal Corporations, 43CJ, section 333, p. 315, n. 54, 58; section 520, p. 403, n. 69; Nuisances, 46CJ, section 5, p. 649, n. 51; section 198, p. 712, n. 79.

*A. J. Bolinger* for appellant.

*Harry H. Kay* for respondent.

BLAND, J.—This is an action to enjoin the City of Versailles from enforcing an ordinance of said city reading as follows:

"It shall be unlawful for any person, firm or corporation to keep any swine within the corporate limits of the City of Versailles, Missouri, from and including April 1st in each year to and including October 15th in such year."

The court enjoined the city from enforcing the ordinance and it has appealed.

The facts show that the mayor and the marshal of said city let it be known by advertisement that the ordinance would be enforced. Plaintiff, a taxpayer in the city, resides upon a tract of five acres belonging to his son. The land consists of pasture land with a

draw running through it. It is rough and ragged and cannot be built upon generally. In an inclosure of four and one-half acres of the land in question plaintiff keeps twenty-three pigs and six sows.

The evidence shows that while the land in question is in a residence section of the town the city is not thickly built up at this point, there being only one house on the east side of the tract, two houses on the south side, one of which is situated on a ten-acre tract, and some houses upon the north and west upon streets running along those sides of the pasture. There was evidence that there were other "acreages" of rough pasture land within the city limits.

Section 8472, Revised Statutes 1919, authorizes the board of alderman of cities of the fourth class, within which the City of Versailles falls, to regulate or prohibit the running at large of live stock, including hogs. Section 8477, Revised Statutes 1919, authorizes the board of aldermen to regulate and suppress pig pens "and to pass ordinances for the prevention of nuisances and their abatement." But the legislature has never empowered cities of this class to prohibit the keeping of animals within the city when such keeping does not constitute a nuisance *per se*. [Brown v. Carrollton, 122 Mo. App. 276, 281.] "A nuisance at law or a nuisance *per se* is an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surrounding." [46 C. J., pp. 664, 649.]

It is well stated in 43 C. J., pp. 314, 315:

"In the furtherance of the public health, security and comfort of its inhabitants, municipal corporations may regulate the keeping of animals within the corporate limits or within designated districts of the corporation. While an animal which is not a nuisance *per se* cannot be prohibited from being kept within the municipal limits and such prohibition is not warranted under the power to regulate occupations and callings, the keeping of animals within the municipal limits or within designated districts thereof may be prohibited when such keeping affects or disturbs the public health, public peace, public safety, or public decency; but only when it does so," and in 46 C. J., pp. 711, 712:

"The raising of pigs or hogs being a lawful business, the keeping thereof in hog ranches, piggeries, or other places is not a nuisance of itself or *per se*, even though it may cause some annoyance in the locality. But the keeping of hogs or pigs in hog-pens, hog ranches, piggeries, or other places may constitute a nuisance by reason of the manner in which they are kept or the locality or both. It may constitute both a public and private nuisance, as for instance, when it is offensive or dangerous to the health of complainant and the public. The keeping of hogs in the thickly built-up part of the city

has been held to be a nuisance *per se*." [See, also, 2 Dillon on Municipal Corporations (5 Ed.), sec. 693.]

The ordinance in question herein does not declare the thing prohibited therein to be a nuisance, but may be upheld if it is a valid exercise of the police power of the city to abate nuisances. There is no question but that sections 8477 and 8521 empower the city to abate nuisances that are in fact such, and to regulate the keeping of animals within its corporate limits, but it cannot suppress the keeping of such animals when their keeping does not amount to a nuisance *per se*, under the guise of regulating their keeping. As was well said in the case of the City of St. Joseph v. Georgetown Lodge, 11 S. W. (2d) 1082, 1083:

"As was said in Lakeview v. Letz, 44 Ill. 81, and quoted with approval by Judge Scholfield in Village of Des Plaines v. Poyer, 123 Ill. 348, 14 N. E. 677 (5 Am. St. Rep. 524), 'there are some things which in their nature are nuisances and which the law recognizes as such; there are others which may or may not be so, their character, in this respect, depending on circumstances. In the latter instance it is manifestly beyond the power of the municipality to declare in advance that those things are a nuisance.'

"While it is true that the court cannot substitute its discretion for that of municipal legislation (Kansas City v. McAleer, 31 Mo. App. 433), still the courts have always held that the city had no right by ordinance to make that a nuisance which is not in fact a nuisance. [Union Cemetery Ass'n v. Kansas City, 352 Mo. 466, 161 S. W. 261.]"

As the keeping of hogs is not a nuisance *per se* the ordinance of the City of Versailles attempting to prohibit their keeping anywhere within the city is void. The fact that hogs are prohibited in the city only from April 1st to October 15th in each year and are permitted between October 15th and April 1st, does not render the ordinance valid on the theory that because it does not in terms prohibit their keeping entirely, it is merely a regulatory ordinance. A rule that hogs may not be kept in a city from April 1st to October 15th would in many cases amount to an absolute prohibition of hogs within the city limits at all, for such a requirement would force many who had no other place to keep their hogs to sell them before April 1st regardless of market conditions. In other words the right to have hogs in the city limits is so circumscribed by the ordinance as to make it a wholly unreasonable regulation if not a prohibition.

The city in enacting this ordinance no doubt thought that hogs can be kept in a more sanitary way in winter than in summer. However, a consideration of this kind is dependent upon the manner in which hogs are kept. The keeping of hogs in a filthy pen near a dwelling in a city or town is a nuisance *per se* whether they are

kept in winter or summer. [Whipple v. McIntyre, 69 Mo. App. 397.] Hogs may be kept even in the summer time so as not to be obnoxious to the health of human beings. It is well known that a hog is one of the cleanest of animals, so far as his person is concerned, if given a chance to be clean. However, he is often given food that no other animal will eat on account of its decayed or semi-decayed state, with its consequent odors, and is cooped up in a small inclosure, where on account of his nature to root, becomes full of holes for the gathering of moisture or water. All of these things tend to promote decomposition in the offal of and what small amount of food is wasted by the animal. For these reasons if not kept clean a pig pen is considered extremely offensive to the smell and inimical to health and it may become so regardless of the character of food given the hogs therein. But if given a wide range on a pasture with plenty of water and with no other food than the pasturage, or even other food that is not subject to decomposition, he is as free from offensive odors even in the summer time as any ordinary domestic animal and is in no sense inimical to health. So to proscribe hogs on the ground that they are nuisances in the summer time, regardless of how they may be kept, is wholly arbitrary and cannot be upheld as an effort to abate a nuisance *per se.*

We have examined the case of Smith v. Collier, 118 Ga. 306. The syllabus in that case seems to support the city's contention as to the validity of the ordinance in this case, but no part of the opinion is printed and it is impossible for us to know on what theory the court decided as indicated in the syllabus. It may have been on account of some statute existing in that state. The case is of little weight in the absence of a statement of the theory upon which the court decided the case. The facts in that case may have been wholly unlike these.

There are cases in other states than our holding that it is within the power of a city council to declare as a police regulation a thing to be a nuisance whether it is in fact a nuisance of itself. But whatever the rule may be in other states it is the rule in Missouri that a city, unless empowered by statute or by charter, has no right to prohibit a thing on the ground that it is a nuisance unless it is a nuisance *per se;* that at most it can suppress a thing that is a nuisance under the particular circumstance, but it cannot suppress it regardless of circumstances when the city is only given power to regulate. [City of St. Joseph v. Georgetown Lodge, supra; City of St. Louis v. Atlantic Quarry & Construction Co., 244 Mo. 479; 43 C. J., p. 252.] We are not prepared to say that the keeping of hogs any place in some cities may not be a nuisance *per se* but we do hold that hogs may be kept in a city of 1651 people (which is the popu-

lation of Versailles according to the last government census) having pastures of large acreage, without their being a nuisance.

The Missouri cases cited by defendant are not in point. In the case of St. Louis v. Fisher, 167 Mo. 655, and St. Louis v. Schefe, 167 Mo. 666, the charter gave the City of St. Louis power to *prohibit* cow stables and dairies as well as regulate them. [See City of St. Louis v. Construction Co., supra, 1. c. 490.] In the case of Bellerive Ins. Co. v. Kansas City, 13 S. W. (2d) 628, an ordinance was upheld that merely regulated the keeping of automobiles in buildings used for dwelling purposes by limiting their number and did not prohibit altogether the keeping of such automobiles. The court in the case of City of Tarkio v. Miller, 167 Mo. App. 122, upheld an ordinance which forbid the breeding of stallions to mares in such a manner as to scandalize and disturb the peace of the inhabitants of the neighborhoiod and to violate public decency. In that case the court said 1. c. 123:

"The keeping of stallions for breeding purposes is lawful and necessary and *per se* is not a nuisance. But it is a business which, like many others, may be conducted in such a manner as to become a nuisance *per· se.*"

In that case the ordinance regulated merely the breeding of stallions to mares within the city but the ordinance did not forbid the keeping of stallions nor the breeding of them within the city limits.

The city attempts to uphold the ordinance on the theory that plaintiff was keeping a pig pen and as section 8477, Revised Statutes 1919, gives the city the right to suppress pig pens the ordinance may be upheld on this theory. In the first place the ordinance, while general enough to include pig pens, is not aimed at such pens but prohibits the keeping of hogs at any place within the city limits within the dates specified in the ordinance. In the second place, while perhaps beside the question, there is testimony that plaintiff kept twenty-nine hogs upon his four and one-half acres of pasture land. Under the circumstances it is apparent that he was not keeping a pig pen. Webster defines a pen as a small inclosure for animals. Of course, it cannot be determined from the mere size of the inclosure as to whether or not it is a pen, but the matter is largely to be determined as to the number of animals kept within the inclosure in relation to its size, that is, the degree of congestion of hogs therein. Ordinarily an inclosure covering an area of four and one-half acres would not be considered a pen but if thousands of hogs were kept therein it might be so construed. However, as before stated the ordinance is not leveled at pig pens and cannot be upheld on the theory now advanced by the city. The city also insists that:

184

"That if the city has power to prevent hogs from running at large and also to abate and suppress pens, then it follows that by a combination of these powers it might prohibit the keeping of swine altogether, for they could be kept in no other way."

From what we have said it is apparent that hogs may be restrained from running at large and yet not be confined in pig pens.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.